IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHARON K. HARRELL, )
 )
        Plaintiff, )
 )
vs. ) Case No. 17-cv-00025-JPG-CJP
 )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
 )
        Defendant.[1] )

## MEMORANDUM & ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Sharon K. Harrell, proceeding *pro se*, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB in October 2012, alleging an onset date of April 11, 2008. (Tr. 180-83, 91-92.) The Social Security Administration denied her claim at the initial level, (Tr. 91-96), and again at the reconsideration level, (Tr. 99-106.) Plaintiff requested an evidentiary hearing. (Tr. 121-25.)

Administrative Law Judge (ALJ) Kevin R. Martin conducted a hearing on September 30, 2014 (Tr. 40-89), and issued an unfavorable decision on December 23, 2014. (Tr. 24-34.) The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-19); *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court. (Doc. 1.)

## Plaintiff's Argument

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. *See* FED. R. CIV. P. 25(d); 42 U.S.C. §405(g).

1

Plaintiff asserts the ALJ committed reversible error in assessing plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently

unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision not to determine whether plaintiff was, in fact, disabled at the relevant time, but to ensure that the decision was supported by substantial evidence and that the Commissioner made no mistakes of law. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**The Decision of the ALJ**

ALJ Martin followed the five-step analytical framework set forth above. He determined plaintiff last met the insured status requirements through December 31, 2013, and had not engaged in substantial gainful activity since her alleged onset date of April 11, 2008. The ALJ opined plaintiff had severe impairments of degenerative disc disease (DDD) of the lumbar spine; obesity; status post right wrist fracture; and bilateral carpal tunnel syndrome. (Tr. 26.) He further determined plaintiff had the RFC to perform light work except that she could only frequently handle and finger bilaterally. (Tr. 28.) ALJ Martin concluded that, although plaintiff could not perform any past relevant work, she could perform other jobs that existed in the economy. (Tr. 33.) He thus found her not disabled. (Tr. 34.)

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed at plaintiff's argument.

    **1.    Agency Forms**

Petitioner was born on August 17, 1953, and was fifty-four years old on her alleged onset date. She indicated that the following conditions limited her ability to work: systemic lupus; an unhealed broken right wrist; irritable bowel syndrome (IBS); fatigue; restless leg syndrome;

4

arthritis in the right knee and hip; vertigo; memory loss; sun sensitivity; and numbness in both hands. Plaintiff weighed 180 pounds and was 5'1" tall. (Tr. 248-252.)

Plaintiff's highest level of education was twelfth grade. She previously worked in data entry at US Bank, Missouri Goodwill, Reality Systems, and Cintas Corporation from 2001 to 2011, and held a temporary job at Kelly Services from 1997 to 2000. (Tr. 253.)

Plaintiff stated she could lift about five pounds for a few minutes; write for a short period; hold her arms out for two to three minutes; sit and stand for up to ten to fifteen minutes each; and walk for about fifteen minutes. (Tr. 278.)

On an average day, plaintiff ate breakfast, did dishes, rested, ate lunch, watched television, made dinner, rested again, then watched more television. Plaintiff was able to clean her floors once per week, prepare meals up to six times per week, grocery shop up to twice per week, dust, feed her pets, and wash laundry. (Tr. 280, 281.) Plaintiff could not lift, open jars, write, type, stir pots, or use tongs for more than two to three minutes. She could not bend, kneel, stand, or walk long distances. She could not drive frequently due to numbness in her hands. Plaintiff experienced constant pain in her back, neck, shoulder, hip, knee, calf, wrist, and right-hand fingers. (Tr. 279, 281.)

Petitioner stated she could not afford medical treatment because she did not have insurance. (Tr. 286.) Petitioner's spouse completed a function report, corroborating plaintiff's alleged limitations. (Tr. 260-67.)

2. **Evidentiary Hearing**

ALJ Martin presided over an evidentiary hearing in September 2014. Plaintiff's counsel explained plaintiff suffered from a history of urinary stress incontinence and IBS, and had a

5

positive ANA test[2] with an associated diagnosis of lupus. Her symptoms included chronic fatigue and frequent bathroom breaks. (Tr. 44.)

Plaintiff owned crops, which generated approximately $3,000 per year, and also had an oil interest, which generated between $6,000 and $8,000 per year. (Tr. 48-49.)

Plaintiff had issues with her right wrist; right "baby" finger, thumb, and forefinger; and her left thumb and finger. She had no strength in her left hand and her bladder leaked. In addition, plaintiff had IBS and plantar fasciitis. (Tr. 54-55.)

In 2003, plaintiff was diagnosed with lupus, which made her exhausted; affected the tendons in her knees, elbows, hips, and back; and caused headaches. Plaintiff did not receive treatment for lupus because she did not have insurance. She instead treated with ibuprofen. (Tr. 59-60.)

Plaintiff had vaginal pain and bleeding since 2005 due to "bad mesh." She treated with a gynecologist briefly but could not afford further procedures. (Tr. 62-63.) Petitioner experienced problems with her left thumb and finger for "a couple of years." Plaintiff treated with an orthopedist who believed plaintiff overused her left hand because of the pain in her right hand. (Tr. 63.) In June 2014, plaintiff began experiencing shoulder pain, which did not respond to steroid injections. (Tr. 63-64.) She suffered from IBS for fifteen to twenty years and also had a spastic colon, which necessitated frequent and lengthy bathroom breaks. She treated these conditions with Levsin. (Tr. 64-67.) Plaintiff had experienced back and hip pain for ten to fifteen years. The pain made sitting for long periods "miserable." She treated these conditions with muscle relaxers, Tramadol, and Celebrex. She also attended physical therapy in the past. Plaintiff's doctor most recently advised her to stretch. (Tr. 67-69.) Plaintiff had problems with

---

[2] An ANA test tests the presence of antinuclear antibodies. "While most people with lupus have a positive ANA test, most people with positive ANA do not have lupus." MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/lupus/diagnosis-treatment/drc-20365790 (last visited Dec. 18, 2017).

bladder control since 2005, which deterred her from being around other people and caused urgent bathroom breaks. (Tr. 69.) Plaintiff had plantar fasciitis since the early 2000s. (Tr. 71.) Plaintiff experienced pain and headaches every morning upon waking-up. (Tr. 70.)

Plaintiff's husband did most of the cooking. She could "Swiffer" the floor occasionally, but her husband performed most of the household chores dating back four years. Plaintiff grocery shopped approximately once per week. She had five dogs but no longer helped feed or water them. (Tr. 71, 76.)

Plaintiff went on a cruise every few years and she last vacationed in Cozumel, Mexico in May of that year. Her daughter fronted the money for the trip. (Tr. 77-78.) Petitioner used a computer "very little" because of pain in her hand. (Tr. 78.)

Plaintiff was able to sit comfortably for fifteen minutes. She could not stand very long and could walk "a little bit." She was unable to lift or carry anything. (Tr. 79.)

Petitioner acquired health insurance in May 2014. The ALJ asked, "Why did your children pay for a cruise but not for healthcare coverage?" Plaintiff responded that her daughter was in school and could not afford to pay for plaintiff's insurance on a monthly basis. (Tr. 80.)

Plaintiff worked while experiencing urinary incontinence, but she was "wet all the time" and often missed work. In 2007, plaintiff missed thirty-eight days of work. (Tr. 81-82.)

### 3. Medical Records

Plaintiff treated with Dr. Kent Campbell throughout the relevant period. On June 4, 2008, plaintiff presented to Dr. Campbell and complained of back, arm, and shoulder pain. On examination, she demonstrated complete motion of her C-spine and thoracic region, full range of motion (ROM) in her shoulder, and equal grip. Dr. Campbell noted spasms and tenderness in the paravertebral musculature throughout the spine. He assessed plaintiff with chest and back pain, and noted, "[g]entle manipulation today to the cervical and upper thoracic spines, with excellent

7

result." Dr. Campbell prescribed plaintiff Motrin and Parafon Forte.[3]  (Tr. 428.)

On July 11, 2008, plaintiff reported diarrhea. Dr. Campbell assessed plaintiff with IBS. He advised plaintiff to continue on a restrictive diet. (Tr. 427.)

On October 23, 2008, plaintiff presented to Dr. Campbell with complaints of a tender lump in her neck and a sore back. Plaintiff demonstrated full ROM throughout the spine and shoulders. A straight leg-raising test[4] was negative at ninety degrees. Dr. Campbell assessed plaintiff with cervical adenitis; neck and low back pain; and restless leg syndrome. He noted "Gentle manipulation today throughout the spine with excellent results." He prescribed Darvocet.[5] (Tr. 426.)

Plaintiff presented to Dr. Campbell on February 3, 2009. She complained of continued discomfort in her lower back. On examination, Dr. Campbell noted full ROM of plaintiff's spine, extremities, and both hips. He assessed plaintiff with colonic polyps and ordered a colonoscopy. He also noted, "[g]entle manipulation today throughout the spine with excellent results." (Tr. 424.)

In March 2009, plaintiff received scans of her lumbar spine and left hip, which returned "normal" findings. (Tr. 433-35.)

On June 2, 2009, plaintiff presented to Dr. Francisco Garriga with complaints of migraines. She reported she was "doing well off meds." Plaintiff also described severe hip and joint pain. She demonstrated a normal joint review and her hip ROM was normal. Dr. Garriga diagnosed plaintiff with lupus and assessed her with myofascial pain, a history of positive ANA,

---

[3] Parafon Forte "is used to calm muscles." DRUGS.COM, https://www.drugs.com/cdi/parafon-forte-dsc.html (last visited Dec. 18, 2017).
[4] "The Straight Leg Raise (SLR) test is a neurodynamic test. . .These tests, along with relevant history and decreased range of motion, are considered by some to be the most important physical signs of disc herniation . . . ." PHYSIOPEDIA, https://www.physio-pedia.com/Straight_Leg_Raise_Test (last visited Dec. 18, 2017).
[5] Darvocet is a narcotic pain reliever used to relieve mild to moderate pain. DRUGS.COM, https://www.drugs.com/darvocet.html (last visited Dec. 18, 2017).

and stress. He prescribed a trial of prednisone and Plaquenil.[6] (Tr. 455-56.)

Plaintiff established care at Christopher Rural Health on September 21, 2012. She was assessed with IBS, systemic lupus erythematosus (SLE), colon polyps, and resolved headaches. The provider arranged a colonoscopy and discussed scheduling an MRI of plaintiff's brain for her headaches. She refused the MRI and was prescribed Tylenol. She was advised to follow up in two weeks. (Tr. 397.)

Plaintiff underwent a colonoscopy on October 23, 2012. Her postoperative diagnoses included a normal appearing colonoscopy and adhesions of the descending colon. (Tr. 442-44.)

On June 4, 2013, plaintiff presented to Dr. Mario Salinas with pelvic pain and pressure. She reported intermittent vaginal bleeding and dribbling of urine after voiding. She denied a history of mental illness or psychiatric problems. A review of systems indicated joint stiffness and joint pain. Her assessment included stable SLE and stable microscopic hematuria.[7] Dr. Salinas recommended plaintiff visit a urologist for treatment of hematuria. (Tr. 560-64.)

On June 13, 2014, plaintiff established care with Logan Primary Care Services. She complained of chest and left shoulder pain. She demonstrated full ROM of the spine and extremities. She was assessed with unspecified chest pain and SLE. She was referred for a colonoscopy and advised to follow-up in one week. (Tr. 536-38).

Plaintiff presented to Logan Primary Care Services on June 24, 2014 with complaints of chest and left shoulder pain. She was assessed with atypical chest pain, left upper extremity pain, and elevated/abnormal liver function tests. She was advised to follow-up in one week. (Tr. 532-33.)

---

[6] Plaquenil is used to treat symptoms of SLE. DRUGS.COM, https://www.drugs.com/plaquenil.html (last visited Dec. 18, 2017).
[7] Hematuria refers to the blood in the urine. NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, https://www.niddk.nih.gov/health-information/urologic-diseases/hematuria-blood-urine (last visited Dec. 18, 2017).

On June 27, 2014, plaintiff presented to Dr. Jeffrey Parks with complaints of sudden shoulder and left arm pain that developed on June 2, 2014. Plaintiff was positive for joint stiffness and pain, but denied numbness, tingling, or weakness of her extremities. Dr. Parks diagnosed plaintiff with unstable angina and an abnormal stress test. (Tr. 461-63.) That same day, plaintiff presented to Dr. Maria Falcone, who performed a catheterization laboratory study. The study returned normal findings. (Tr. 464-68.)

On July 3, 2014, plaintiff presented to Logan Primary Care Services with complaints of left shoulder and chest pain. She denied back or abdominal pain. She was assessed with unspecified chest pain, resolved and hematuria. (Tr. 529-30.)

On July 23, 2014, plaintiff presented to Dr. Jo Ann Hine. She complained of moderate incontinence and suprapubic pain. She denied constipation, but reported a decreased stream, incomplete emptying, nocturia, suprapubic pain, urgency, urinary hesitancy, and urinary incontinence, mixed type. Plaintiff was also positive for musculoskeletal pain. (Tr. 550-55.)

On October 2, 2014, plaintiff presented to Dr. Brent Newell for a nerve conduction study. She complained of burning left shoulder pain, which began in June and continued intermittently since. The pain radiated up her neck and down her left upper extremity. She experienced tingling in her fourth and fifth left digits. She also had some pain in her right upper extremity. An electrodiagnostic study revealed evidence of a mild to moderate bilateral median neuropathy at the wrist (carpal tunnel syndrome), which was worse on the left. There was no evidence of ulnar neuropathy at the elbow or cervical radiculopathy in the nerves or muscles of either upper limb. (Tr. 591-94.)

On August 28, 2014, plaintiff presented to Dr. Garriga with complaints of pain in her wrist, finger, and hips. She indicated she applied for social security benefits. Plaintiff reported anxiety, severe depression for six years, two small nodules on her right-hand finger, and IBS. A

Tinel's test[8] was positive on her right and left hand. She had normal ROM of her hips. Plaintiff received a lidocaine injection in her right wrist and Dr. Garriga explained the importance of weight loss and exercise. Dr. Garriga noted, "[s]he may have been disappointed to hear that I could help her; she expressed strong interest in obtaining disability status." (Tr. 579-85.)

Plaintiff also received an x-ray of her right and left hand on August 28, 2014. The right hand demonstrated a remote healed nondisplaced distal radius fracture with a remote non-united ulnar styloid fracture and mild radiocarpal joint space narrowing. There was diffuse periarticular osteopenia, and no erosive changes or subluxations. Her left hand showed minimal boney hypertrophy at the first carpal metacarpal joint with generalized perarticular osteopenia. There were no erosive changes or subluxations. (Tr. 688.)

### 4. State-Agency Consultant Evaluation

State-agency consultant Dr. Adrian Feinerman examined plaintiff on February 4, 2013. Plaintiff complained of pain in her chest, right wrist, hands, elbows, knees, back, hips, and spurs; sun sensitivity secondary to SLE; generalized tendon pain; headaches, dizziness, decreased memory, and urinary incontinence. She denied experiencing depression or anxiety. Plaintiff reported she could walk for two blocks, stand for ten minutes, sit for fifteen minutes, and squat, bend, and perform fine and gross manipulation normally.

On examination, Dr. Feinerman noted "no anatomic abnormality of any extremity and no evidence of redness, warmth, thickening or effusion of any joint." There was "no limitations of motion of any joint," and grip strength was strong and equal, bilaterally. Dr. Feinerman found "no anatomic deformity of the cervical, thoracic or lumbar spine and no limitation of motion of any spinal segment." Plaintiff's ambulation was normal. Her muscle strength was 5/5

---

[8] Tinel's Test (or Sign) is used to detect carpel tunnel syndrome. CARPEL-TUNNEL-SYNDROME.COM, http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited Dec. 18, 2017).

throughout and her fine and gross manipulation were normal. (Tr. 407-12.)

On February 10, 2013, Dr. B. Rock Oh, a state-agency consultant, conducted a records review of plaintiff's file. He opined plaintiff's impairments did not cause significant limitations in basic work activities and were not severe. (Tr. 94.) In August 2013, Dr. Lenore Gonzalez also conducted a records review and affirmed Dr. Oh's opinions. (Tr. 104.)

Dr. Donald Henson, a state-agency consultant, conducted a psychiatric review technique on February 10, 2013. He opined plaintiff's allegation of memory problems were not credible because there was no established medically determinable impairment or medical evidence from a clinical source that suggested such. He noted that a consultative examination did not identify any mental problems. (Tr. 95.) Dr. DiFonso also conducted a state-agency consultant records review in August 2013. She concurred with Dr. Henson's opinions. (Tr. 105.)

## **Analysis**

Plaintiff argues the ALJ improperly assessed her credibility. Before reaching the merits of plaintiff's arguments, the Court notes the Social Security Administrated issued Social Security Ruling (SSR) 16-3p, which supersedes SSR 96-7p ("Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements"). The new ruling, which took effect March 28, 2016, eliminates the use of the word "credibility." SSR 16-3p, at *1. Instead, the new ruling directs an ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Id.* at *2. The SSA stated, "[W]e clarify that subjective symptom evaluation is not an examination of an individual's character." *Id.* at *1.

In *Cole v. Colvin*, the Seventh Circuit explained the new ruling was "meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical

12

evidence." 831 F.3d 411, 412 (7th Cir. 2016).

SSR 16-3p took effect after the ALJ's decision in the present case. However, a rule that clarifies, and does not change, an area of the law is appropriately applied to matters on appeal. *Pope v. Shalala*, 998 F.2d 473, 482-83 (7th Cir. 1993). Thus, the Court will apply SSR 16-3p on review.

Prior to the enactment of SSR 16-3p, courts afforded "special deference" to a credibility determination and overturned the ALJ's finding only if it was "patently wrong." *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). Other courts in the Seventh Circuit continue to cite and apply this standard on review. *See Purvis v. Berryhill*, 2017 WL 1022014, at *17 (N.D. Il. March 16, 2017) and cases cited therein. Because the clarification did not substantively change the law, this Court will continue to apply the "patently wrong" standard as well.

ALJ Martin called plaintiff's credibility into question, in part, because of the sparse medical evidence in the record. He determined plaintiff could afford care, despite her testimony stating otherwise. The ALJ, however, failed to build a logical bridge between the evidence and this conclusion. Thus, this particular finding was erroneous.

The ALJ questioned plaintiff about the lack of medical records and plaintiff explained she could not afford frequent treatment. The ALJ doubted this explanation because plaintiff received royalty payments from oil rights, owned her home, and was able to afford a vacation to Cozumel. The ALJ further noted, "Her amended tax returns show large losses, but these were carried over from prior years and show income consistent with an ability to seek some medical treatment." (Tr. 32.)

An ALJ must "build an accurate and logical bridge between the evidence and the result," *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010), and cannot use speculation to fill evidentiary gaps or draw unsupported inferences, *see Murphy v. Colvin*, 759 F.3d 811, 816-17

13

(7th Cir. 2014).

Here, the ALJ's conclusions regarding plaintiff's financial situation are wholly unfounded. Plaintiff's status as a homeowner is largely irrelevant to whether she can afford treatment, and taking a vacation every few years carries little to no evidentiary value in assessing plaintiff's financial state. Moreover, there is no evidence of how costly plaintiff's medical care would have been; it is therefore inexplicable how the ALJ could determine plaintiff had "income consistent with an ability to seek some medical treatment."

Although the ALJ erroneously assessed plaintiff's financial state, the ALJ's overall assessment of the intensity, persistence, and limiting effects of plaintiff's symptoms withstands scrutiny. As noted above, the new ruling directs an ALJ to focus on a claimant's testimony and objective medical treatment. Here, ALJ Martin provided a fair and detailed discussion of the medical evidence. He considered plaintiff's complaints of pain and noted objective evidence that corroborated some of her alleged symptoms. For instance, the ALJ discussed that plaintiff tested positive for ANA and he noted an electro diagnostic study that revealed carpal tunnel syndrome. ALJ Martin, however, ultimately opined that the objective medical evidence did not support the degree of limitations plaintiff alleged.

In addition, the ALJ found that plaintiff's allegations of severe mental impairments were inconsistent with her statements to medical professionals denying psychiatric problems. This assessment is consistent with the new ruling, which provides, "[w]e will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, *and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.*" SSR 16-3p, at *6 (emphasis added).

Plaintiff also argues the ALJ erroneously failed to consider a statement from Dr. Garriga entitled "Qualifying Pre-existing Medical Certification Form," which lists systemic lupus as a

14

primary pre-existing condition. An ALJ, however, does not need to mention every piece of evidence, so long as he does not ignore an entire line of evidence contrary to his ruling. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, the ALJ provided a detailed discussion of the evidence of plaintiff's SLE:

> The claimant alleged systemic lupus erythematosus. Notes stated that she might have an autoimmune disease, but objective evidence only supported mildly positive ANA, with no definitive diagnosis given. The claimant may have been diagnosed with SLE in past, but the current record does not support this as a medically determined impairment. The evidence presented included diagnoses for lupus that appeared entirely dependent on her reporting a history for this condition. The consultative examination was generally unremarkable, which would not support finding that this condition is severe, even if it were medically determinable. Moreover, this problem is longstanding, she worked with it in the past, and even after stopping working she reported that she had been doing well of medications.

(Tr. 27.) The ALJ indicated uncertainty as to whether plaintiff received a definitive diagnosis of SLE. Regardless, a diagnosis, alone, does not automatically establish resulting limitations for purposes of an RFC assessment. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("The issue in the case is not the existence of these various conditions of hers but their severity and, concretely, whether, as she testified with corroboration by her husband, they have caused her severe pain that she cannot work full time."). The ALJ's analysis demonstrated he considered the effects of SLE on plaintiff's functioning and took into account the objective and subjective evidence on record.

Plaintiff also contests the ALJ's determination that urinary incontinence and IBS did not cause her functional limitations. The ALJ opined: "[t]he claimant reported irritable bowel syndrome and urinary incontinence, but failed to provide evidence showing that these conditions significantly impacted her residual functioning." (Tr. 30.) "The claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*,

15

357 F.3d 697, 702 (7th Cir. 2004).

Plaintiff testified that she missed thirty-eight days of work in 2007 due to incontinence. She posits this was sufficient to establish the severity of her condition because medical tests cannot measure the effects of incontinence on daily living. However, several state-agency medical experts examined plaintiff's records and none determined urinary incontinence or IBS warranted additional limitations beyond those articulated in the RFC assessment. The ALJ acknowledged evidence that supported plaintiff's allegations, including her complaints of suprapubic pain, urinary dribbling, and urinary incontinence. (Tr. 29.) The ALJ also noted that plaintiff treated IBS with medication. (Tr. 29.) He determined, however, that the objective medical evidence showed that plaintiff's IBS and incontinence did not affect her functioning.

Plaintiff does not point to any evidence the ALJ ignored in assessing the effects of her IBS and urinary incontinence. Rather, she disagrees with the weight the ALJ assigned to the evidence. On review, this Court cannot reweigh evidence or resolve conflicts in the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). So long as "the ALJ's factual findings are supported by substantial evidence," the ALJ's decision will be affirmed. *Id.* The ALJ supported his determination with objective, substantial evidence in the record. His conclusion that urinary incontinence and IBS did not cause limitations in plaintiff's residual functionality was therefore not erroneous.

Finally, the ALJ also doubted the degree of limitations plaintiff alleged because Dr. Garriga noted plaintiff was "disappointed to hear that [Dr. Garriga] could help her; she expressed strong interest in obtaining disability status." Plaintiff asserts the ALJ impermissibly drew a negative inference from this statement. However, an ALJ may rely on statements from a physician that suggest a claimant is malingering. *See Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010).

In sum, although the ALJ erroneously determined plaintiff could afford medical treatment, this error was harmless. An error is harmless when the Court is convinced the ALJ would reach the same decision on remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). ALJ Martin addressed each of plaintiff's alleged limitations and articulated reasons for either including or excluding those imitations in the RFC assessment. Thus, any overarching determination regarding plaintiff's character would not affect the outcome of the case on remand. Although the ALJ's assessment was not "flawless," it was not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.** The Clerk of Court is **DIRECTED** to enter judgment in favor of the defendant.

**IT IS SO ORDERED.**

**DATED: DECEMBER 27, 2017**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
